AO 91 (Rev. 11/11) Criminal Complaint

AUSA Steven J. Dollear (312) 353-5359
AUSA Georgia N. Alexakis (312) 353-8897

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED
OCT -5 2017
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MICHAEL JARIGESE | CASE NUMBER:<br><br>17 CR 656<br>MAGISTRATE JUDGE ROWLAND |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about May 22, 2013, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 666(a)(2) | corruptly giving, offering, and agreeing to give things of value, namely approximately $10,000 for the benefit of Public Official A, with intent to influence and reward Public Official A, the mayor of Municipality A, a suburban city located in Cook County, Illinois, that received in excess of $10,000 under a federal program in the twelve-month period from January 1, 2013 through December 31, 2013, in connection with any business, transaction, and series of transactions of $5,000 or more with Municipality A, namely construction contracts with Municipality A. |

This criminal complaint is based upon these facts:

_X_  Continued on the attached sheet.

KATHARINE L. WALKER
Special Agent, Federal Bureau of Investigation

Sworn to before me and signed in my presence.

Date: October 5, 2017

_Judge's signature_

City and state: Chicago, Illinois

MARY M. ROWLAND, U.S. Magistrate Judge
*Printed name and Title*

| | |
|---|---|
| UNITED STATES DISTRICT COURT | ss |
| NORTHERN DISTRICT OF ILLINOIS | |

## AFFIDAVIT

I, KATHARINE L. WALKER, being duly sworn, state as follows:

1. I am a Special Agent with the Federal Bureau of Investigation, and have been so employed for approximately 9 years. My current responsibilities include the investigation of public corruption offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that MICHAEL JARIGESE has violated Title 18, United States Code, Section 666(a)(2). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging JARIGESE with bribery, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that JARIGESE committed the offense alleged in the complaint.

3. This affidavit is based on my personal knowledge, experience, and training; information provided to me by other law enforcement agents; information provided by various witnesses, and in particular, the witnesses described in ¶¶ 4-6 below; and my review of documents, including public and bank records.

### Sources of Information

4. Some of the information in this affidavit has been provided by Public Official A. Public Official A has testified under oath, and in exchange for Public

Official A's truthful cooperation, the government has agreed to recommend a reduced sentence at the time of Public Official A's sentencing. Based upon a criminal history check, Public Official A has no known prior convictions. Some of the information provided by Public Official A has been corroborated by other witnesses, public records, bank records, and records obtained from two businesses: Tower Contracting LLC and Company A.

5. Other information in this affidavit has been provided by Individual A. Individual A has testified under oath without any promises from the government, but Individual A hopes that in exchange for his/her truthful cooperation, the government will take his/her cooperation into account when making charging decisions and later recommend a reduced sentence at the time of Individual A's sentencing. Based upon a criminal history check, Individual A has no known prior convictions. Some of the information provided by Individual A has been corroborated by other witnesses, public records, bank records, and records obtained from Company A.

6. Other information in this affidavit has been provided by Individual B. Individual B has testified under oath, without any promises from the government. Some of the information provided by Individual B has been corroborated by other witnesses, public records, bank records, and records obtained from Tower Contracting LLC.[1]

---

[1] Based upon a criminal history check and information provided by Individual B, law enforcement believes that Individual B was convicted of forgery more than 45 years ago and sentenced to one year of probation as a result.

2

*Background*

7. Municipality A is a suburban city located in Cook County, Illinois. According to information provided to me by the U.S. Department of Transportation, from January 1, 2013, and continuing through December 31, 2013, Municipality A received benefits in excess of $10,000 in grants under a federal program or some other form of federal assistance.

8. Public Official A was the mayor of Municipality A at all times relevant to the events described in this affidavit, including May 2013.

9. According to Public Official A, while Public Official A served as mayor of Municipality A, construction projects in Municipality A were assigned to contractors in a number of ways, including the design build process. For a design build project, a contractor interested in doing work for Municipality A does not need to go through a public bidding process. As mayor of Municipality A, Public Official A could better steer work to a particular contractor when a project did not involve the public bidding process.

10. According to Public Official A, after a contractor was awarded a project by Municipality A, Public Official A had to sign off on paperwork before that contractor could be paid by Municipality A. Employees of Municipality A would verify that the contractor had completed its work and then prepare paperwork for Public Official A to sign approving payment to the contractor. After Public Official A signed that paperwork, it was sent to the bank where Municipality A's funds were held, and the bank issued the payment to the contractor. If Public Official A did not sign the

3

paperwork, the contractor would not be paid. According to Public Official A, Public Official A had the ability to speed up or slow down payments to contractors and vendors.

11. According to Public Official A and documents I have reviewed from Municipality A and Tower Contracting LLC, Tower Contracting LLC is a general contractor who, beginning no later than January 2010 and continuing through at least January 2014, has worked on a number of construction projects for Municipality A, and has received payments from Municipality A for that work. Each of those construction projects paid well over $5,000 to Tower. For instance, from approximately January 2012 to approximately January 2014, Tower Contracting LLC was paid approximately $4,219,188 by Municipality A for construction work in Municipality A through a series of payments, and many of these payments were made by interstate wire transfers. From at least early 2012, JARIGESE has been the president of Tower Contracting LLC.

***In or Around February 2012, JARIGESE Bribed Public Official A With a Check for $75,000 Made Out to a Shell Company Created by Public Official A.***

12. According to Public Official A, Public Official A and JARIGESE met in person around early 2012, when Tower Contracting LLC was preparing to work on an upcoming project for Municipality A. During that meeting, Public Official A noted to JARIGESE that Tower already had performed a substantial amount of work for Municipality A. Public Official A then asked JARIGESE for $100,000. According to

4

Public Official A, JARIGESE responded to this request by saying that he would look into it and get back to Public Official A.

13. Sometime later, according to Public Official A, Public Official A and JARIGESE met again. At this meeting, JARIGESE gave Public Official A a check for $75,000. The check was dated February 14, 2012, was from Tower Contracting LLC, and was made out to Shell Company A. According to Public Official A, Public Official A had previously told JARIGESE to make the check out to Shell Company A, as part of an effort to disguise the fact that JARIGESE's payment to Public Official A was a bribe or kickback.

14. According to Public Official A, as well as public records and bank records I have reviewed, Shell Company A was incorporated in Illinois around 2003 under the name of a member of Public Official A's family. Members of Public Official A's family, at Public Official A's direction, also opened up a bank account for Shell Company A.

15. According to Public Official A as well as public records and bank records I have reviewed, Public Official A also established a second shell company while Public Official A was mayor of Municipality A. That second shell company, Shell Company B, was incorporated in Illinois around 2009 under the name of a business associate of Public Official A. Members of Public Official A's family, at Public Official A's direction, also opened up a bank account for Shell Company B.

16. According to Public Official A, Public Official A originally intended for the Shell Companies to do work related to real estate and remodeling/rehabilitation.

But according to Public Official A, the Shell Companies never did any such work, an assertion corroborated by Individual A, as discussed in ¶¶ 46-48 below; bank records I have reviewed for the Shell Companies; and the absence of public or business records reflecting the performance of any work related to real estate, remodeling, or rehabilitation by the Shell Companies.

17. Bank records for Shell Company A reflect that between approximately June 2008 and June 2013, about $153,931 was deposited into a checking account for Shell Company A, and that around $85,000 of that amount came from checks from Tower Contracting LLC. Another approximately $63,750 came from bribe and kickback payments made to Public Official A by Individual A and Company A, as discussed in ¶¶ 39-48 below. Those same bank records show that between approximately July 2008 and August 2016, at least around $132,105 was withdrawn from the bank account for Shell Company A by Public Official A or members of Public Official A's family, for their personal use and benefit, or was transferred to the bank account for Shell Company B.

18. Bank records for Shell Company B reflect that between approximately July 2011 and September 2013, approximately $83,000 was deposited into a checking account for Shell Company B.[2] Approximately $33,000 of that amount came from checks from Company A, as discussed in ¶¶ 41 and 47 below; approximately $15,000 of that amount came from a company run by a business associate of Public Official A;

---

[2] The checking account for Shell Company B had a balance of $31,295 as of December 31, 2010.

and approximately $35,000 came from Shell Company A. Those same bank records show that between approximately January 2011 and October 2015, at least around $87,295 was withdrawn from the bank account for Shell Company B by Public Official A or members of Public Official A's family, for their personal use and benefit.

19. According to Public Official A, by having JARIGESE and Individual A make out the checks to Shell Company A and Shell Company B, their payments would appear to be for legitimate work done by the Shell Companies rather than bribes or kickbacks to Public Official A.

20. As further part of the effort to disguise the nature of the payments to the Shell Companies, according to Public Official A, at the same time that JARIGESE handed him the $75,000 check in or around February 2012, JARIGESE also showed Public Official A an invoice. According to Public Official A, Public Official A did not create this invoice and did not ask JARIGESE to create this invoice. According to Public Official A, JARIGESE told Public Official A that the invoice would help demonstrate (falsely) that Shell Company A had done work for Tower.

21. I have reviewed the invoice that JARIGESE showed Public Official A. The top of the invoice has the name of Shell Company A, along with a P.O. Box associated with Shell Company A. The invoice also has a logo on it, which is purportedly the logo for Shell Company A. The language of the invoice states that in early February 2012, Shell Company A had done construction-related work on Tower's premises and that the cost of this work was $75,000. As explained above,

*see* ¶ 16, Public Official A stated that Shell Company A did not perform construction work for anyone, including Tower.

22. Law enforcement has also shown this invoice to Individual B, who worked at Tower in February 2012. According to Individual B, based on his/her experience working at Tower, the invoice that JARIGESE gave Public Official A in February 2012 does not appear to reflect actual work done by Shell Company A for Tower. More specifically, Individual B does not remember construction work being done at Tower in early February 2012, by Shell Company A or any other outside contractor or vendor.

23. In addition, the date on the invoice is February 6, 2012, and the $75,000 check from Tower to Shell Company A was dated February 14, 2012, just eight days later. According to Individual B, in the construction business, the standard practice is for invoices to say "net 30," meaning that the invoices are not paid until 30 days after the invoice is received. Based on Individual B's experience working at Tower, Tower typically paid invoices at the end of the 30-day period.

24. Furthermore, the invoice is stamped "Posted," but according to Individual B, the invoice does not include any other information that Individual B would normally have seen on an invoice submitted to, and paid by, Tower. For instance, according to Individual B, a typical invoice at Tower included an internal code, also known as a job code, as well as the initials of the project manager at Tower who had approved the work performed by the outside contractor. The invoice that JARIGESE handed to Public Official A does not contain this information.

25. Finally, according to Individual B, during Individual B's time working at Tower, he/she came to recognize the names of most of the subcontractors and vendors that Tower used. But during Individual B's time working at Tower, Individual B never heard of Shell Company A.

26. According to Public Official A, Public Official A understood that JARIGESE gave Public Official A the $75,000 check because JARIGESE and Tower had been getting work from Municipality A and wanted to secure future work from Municipality A. In exchange for payments, Public Official A would use his/her position as mayor to steer work in Municipality A to JARIGESE and Tower. According to Public Official A, based on their past dealings, JARIGESE was aware that Public Official A had the authority to steer contracts from Municipality A to Tower, especially for a design build project.

27. According to bank records I have reviewed, the $75,000 check Public Official A received from JARIGESE was deposited in the bank account for Shell Company A on or about March 19, 2012. According to bank records I have reviewed as discussed in ¶ 17 above, as well as information from Public Official A, Public Official A and members of Public Official A's family later withdrew those funds for their personal use and benefit.

### *In or Around May 2013, JARIGESE Bribed Public Official A With a Check for $10,000 Made Out to Shell Company A*

28. According to Public Official A, in or around May 2013, JARIGESE handed Public Official A a check for $10,000. I have reviewed a copy this check, which is from Tower to Shell Company A and is dated May 22, 2013.

9

29. According to Public Official A, Public Official A understood this $10,000 check to be another partial payment on the $100,000 that Public Official A had originally requested from JARIGESE in or around early 2012.

30. I have reviewed documents from Tower related to this $10,000 check. According to a check stub associated with the $10,000 check that I have reviewed, it appears that Tower employees recorded the $10,000 check as a donation from Tower to an annual fall festival hosted by Municipality A. Based on information provided by Individual B, and based on my training and experience as well as the training and experience of other law enforcement officers with whom I have spoken, I do not believe that check stub accurately reflects the purpose of the $10,000 check. First, the May 2013 check was made out to Shell Company A, not Municipality A or some entity associated with the festival. Second, according to Individual B, based on his/her experiences working at Tower, a check for the fall festival would typically not have been cut as early as May.

31. I have also reviewed an internal Tower check request related to the $10,000 check that I obtained from Tower. The request is dated May 22, 2013, and it looks like the request was made by JARIGESE because the request has the initials "MAJ" on it, and those are JARIGESE's initials. It appears that the request was signed and approved the day before, May 21, 2013, by another Tower employee, Individual C. According to the check request, the check is a donation to Municipality A's festival, but the request also contains handwriting indicating that the check is related to a particular job number, or internal code. According to Individual B, the

job number that appears on the check request is the same job number used by Tower for a construction project that Tower was working on at the time for Municipality A. According to Individual B, if the $10,000 check was actually a donation to the fall festival, it should not have been charged back to the construction project. Instead, it should have been booked in the company's donations expense category.

32. According to bank records I have reviewed, the $10,000 check Public Official A received from JARIGESE in May 2013 was deposited in the bank account for Shell Company A on or about June 12, 2013. According to bank records I have reviewed as discussed in ¶ 17 above, as well as information from Public Official A, Public Official A and members of Public Official A's family later withdrew those funds for their personal use and benefit.

### *JARIGESE Also Gave Public Official A Thousands of Dollars in Cash as Bribes and Kickbacks.*

33. In addition to the $75,000 and $10,000 checks, according to Public Official A, JARIGESE also gave Public Official A cash payments, which Public Official A understood were also partial payments toward the $100,000 that Public Official A had asked for in or around February 2012. According to Public Official A, JARIGESE gave him cash on 5 to 10 occasions beginning sometime after February 2012 and continuing through May 2013. According to Public Official A, the most cash that JARIGESE paid him at one time was approximately $2,500.

34. According to Public Official A, JARIGESE arranged to deliver these cash payments to Public Official A when JARIGESE knew that Public Official A would be alone in his/her office in Municipality A's City Hall. On at least three occasions when

11

JARIGESE paid Public Official A cash, JARIGESE arrived at Public Official A's office with a coffee cup, which JARIGESE would hand to Public Official A. Inside the coffee cup was cash. According to Public Official A, Public Official A understood that JARIGESE used the coffee cup to conceal the fact that JARIGESE was making payments to Public Official A.

35. According to Individual B, when he/she was employed by Tower, on multiple occasions, he/she overheard JARIGESE ask Individual D, Tower's controller, to make out a check to Tower. JARIGESE then asked Individual D to call the bank beforehand so the bank could have the cash ready for Individual D. Individual B typically heard Individual D make that call to the bank and then saw Individual D leave Tower's offices.

36. About 3-4 times a year, Individual B heard JARIGESE tell Individual D that JARIGESE was going to meet with Public Official A, and then JARIGESE would ask Individual D to make out a check to Tower and go cash it at the bank. Individual B then heard Individual D call the bank and then saw Individual D leave Tower's offices.

37. According to bank records I have reviewed for Tower Contracting LLC, beginning on or about October 17, 2011, and continuing until on or about September 12, 2013, approximately 18 checks were written from Tower's checking account to "cash" for a total of approximately $58,926.

38. According to bank records I have reviewed for Tower Contracting LLC, beginning on or about May 3, 2011, and continuing until on or about November 6,

2013, approximately 35 checks were written from Tower's checking account to JARIGESE for a total of approximately $57,183.

***Beginning No Later than Late 2008 and Continuing Through At Least June 2013, Individual A Gave Public Official A Approximately $178,000 in Bribes or Kickbacks Via Checks Made Out to the Shell Companies and a Family Member of Public Official A***

39. Individual A is the president of Company A. According to Individual A as well as documents I have reviewed from Company A and Municipality A, beginning no later than April 2008 and continuing through at least 2016, Company A has performed various construction projects for Municipality A and been paid by Municipality A for that work.

40. According to Individual A, as well as bank records and records provided by Company A that I have reviewed, between approximately late 2008 and continuing through 2013, while Company A was doing work for Municipality A, Individual A gave Public Official A approximately seven checks totaling approximately $174,015. In addition to these seven checks, according to Individual A, sometime between December 2008 and October 2011, he/she gave Public Official A at least $2,000 on at least two separate occasions.[3]

41. According to both Individual A and Public Official A, Public Official A asked Individual A to make these payments in private meetings that typically took

---

[3] According to Public Official A, between approximately late 2008 and October 2011, Individual A gave Public Official A six checks, totaling approximately $165,015, as well as a handful of cash payments with each payment ranging between $1,000 and $2,000.

place in Public Official A's office in Municipality A's City Hall. Individual A then delivered checks and cash to Public Official A in similarly private meetings.

42. According to Individual A, Individual A paid Public Official A for reasons similar to those of JARIGESE. More specifically, Individual A paid the requested bribes to Public Official A because Individual A wanted Company A to get paid in a timely way by Municipality A and because Individual A wanted Company A to get future, additional work from Municipality A. Based on Individual A's experience dealing with Public Official A, Individual A believed that when Public Official A had authority, discretion, and influence over whether a particular contractor received a particular job, Public Official A could and would exercise that authority, discretion, and influence in favor of Individual A and Company A. According to Individual A, Individual A believed that if he/she ever said no to Public Official A's requests for money, Company A would probably not get any future work from Municipality A.

43. Public Official A has a similar understanding as to why Individual A made payments to him beginning in or around December 2008. According to Public Official A, and based on Public Official A's conversations with Individual A, Individual A paid Public Official A money so that Public Official A would help Company A get paid in a timely fashion for its ongoing work for Municipality A and to help Company A secure future work from Municipality A. Furthermore, according to Public Official A, and again based on Public Official A's conversations with Individual A, Individual A believed that if he/she said no to Public Official A's requests for money, Company A would no longer get work from Municipality A.

44. According to Public Official A, after receiving the first check from Individual A sometime in approximately December 2008, at times, Public Official A used his/her authority as mayor to get Individual A and Company A work with Municipality A. For example, when Public Official A was contacted by other city employees about emergency or time-sensitive projects that needed to be done in Municipality A—projects that were not subject to a public bidding process—Public Official A would instruct city employees to call Company A to do the work.

45. In addition, according to Individual A, Individual A thought that if he/she paid Public Official A, Public Official A would put in a good word for Company A with general contractors—like Tower Contracting LLC—looking to hire a subcontractor to do the particular kind of construction work that Company A performed. Indeed, according to Individual A as well as Tower's bank records, since at least approximately 2011, Tower Contracting LLC has hired Company A as a subcontractor on multiple construction projects.

46. According to Public Official A, Individual A, and bank records I have reviewed, when Individual A made payments to Public Official A with a check, he/she did so, at Public Official A's direction, by writing checks out to Shell Company A, Shell Company B, and to a member of Public Official A's family.

47. According to Public Official A, by having Individual A make out the checks to Shell Company A and Shell Company B, the payments from Individual A would appear to be for work done by the Shell Companies rather than bribes or kickbacks to Public Official A.

48. As part of this attempt to disguise the true nature of the payments from Individual A to Public Official A, checks that Individual A delivered to Public Official A sometimes included additional false information in the check's memo line. For example, one of the checks that Individual A delivered to Public Official A was drafted on a personal account used by Individual A and had the word "kitchen" in the memo line, thus making it appear that the check was a payment from Individual A to one of the Shell Companies for work performed by one of the Shell Companies. In fact, the Shell Companies never performed any such work, as discussed in ¶ 16 above.

*Conclusion*

49. Based on the foregoing, I submit that there is probable cause to believe that on or about May 22, 2013, MICHAEL JARIGESE corruptly gave, offered, and agreed to give things of value, namely, approximately $10,000, for the benefit of Public Official A, with intent to influence and reward Public Official A, the mayor of Municipality A, a suburban city located in Cook County, Illinois, that received in excess of $10,000 under a federal program in the 12-month period from January 1, 2013 through December 31, 2013, in connection with any business, transaction, and series of transactions of $5,000 or more with Municipality A, namely, construction contracts with Municipality A, in violation of 18 U.S.C. § 666(a)(2).

FURTHER AFFIANT SAYETH NOT.

*[signature]*
KATHARINE L. WALKER
Special Agent,
Federal Bureau of Investigation

SUBSCRIBED AND SWORN to before me on October 5, 2017.

*[signature]*
MARY M. ROWLAND
United States Magistrate Judge